SAMUEL SANDLER *vs.* BOSTON AUTOMATIC FIRE ALARM
COMPANY.

Suffolk.   May 1, 1939. — July 20, 1939.

Present: FIELD, C.J., QUA, DOLAN, COX, & RONAN, JJ.

*Contract*, Construction, Performance and breach, For alarm service.
*Evidence*, Relevancy.

Regulations of the national board of fire underwriters properly were
considered in construing a contract in writing of an automatic fire
alarm company with a customer in Boston as to equipment and serv-
ice "according to the rules of the Boston Board of Fire Underwriters,"
where there was evidence that the Boston board had no written regu-
lations independent of those issued by the national board but generally
governed themselves by the regulations of the national board.

Upon evidence at the trial of an action against an automatic fire alarm
company for breach of a contract to supply equipment and service to
the plaintiff, the contract was construed as imposing upon the defend-
ant no obligation greater than that imposed by regulations of the
national board of fire underwriters; and, there being no evidence
that equipment supplied by the defendant was not installed accord-
ing to those regulations, and no direct evidence of any defect in such
equipment, or evidence leading to more than a conjecture as to whether
a defect, found to exist, was in the defendant's equipment or in that
over which it had no control, or evidence that the defendant insured
proper functioning of equipment which was in the care of the plain-
tiff, a verdict for the plaintiff was not warranted.

CONTRACT OR TORT.   Writ in the Superior Court dated
February 26, 1934.

The case was tried before *Walsh*, J., and a verdict was
returned for the plaintiff in the sum of $5,063.50.

*C. R. Branch*, (*C. Ryan* with him,) for the defendant.

*C. C. Steadman*, (*J. A. Kline* with him,) for the plaintiff.

Cox, J.   The declaration in this case was originally in
two counts; the second count, in tort, was waived in open
court, and the case went to the jury upon the first count,
in contract, which alleged, in substance, that the plaintiff,
whose building was equipped with an automatic sprinkler
system, so called, had on January 1, 1934, an oral contract

with the defendant, by the terms of which the latter undertook to provide the plaintiff, at his premises in Boston, with its so called automatic sprinkler water flow signaling devices and alarm valves service; that the defendant undertook to operate said service and to keep in good repair the necessary apparatus; that said service included the receipt of an automatic alarm at the defendant's central office in the event of a sprinkler head opening for any reason, whereupon, on the receipt of such an alarm, the defendant was required immediately to notify the fire and protective departments and immediately to proceed to the premises and shut off the water; that about January 1, 1934, sprinkler heads in the plaintiff's premises opened, freeing large volumes of water and causing damage to the plaintiff and his tenants; that the defendant, in violation of its agreement, failed promptly to respond or to go to the plaintiff's premises, failed promptly to notify the fire and protective departments, and failed to shut off the water. The jury returned a verdict for the plaintiff. The case is here on exceptions of the defendant which states, in its brief, that "The most important exception is to the refusal of the court to direct a verdict for the defendant. The defendant also presses exceptions to certain parts of the charge to the jury and exceptions to refusals of the court to grant certain requested instructions."

The jury could have found that the plaintiff purchased the building in question from one McGaw, in December, 1928, at which time it was equipped with the sprinkler, automatic fire alarm, and automatic water flow alarm systems; that about that time the parties signed an agreement that reads as follows: "The premises number 128–132 Washington St., North Boston, Mass., being equipped with the Automatic and Direct Manual Fire Alarm Apparatus of the Boston Automatic Fire Alarm Co., and the same being connected with its Central Station so as to receive and send fire alarms to the Engine and Ladder Houses nearest said building, or to the Fire Department Headquarters, also to the headquarters of the Boston Protective Department, according to the rules of the Bos-

ton Board of Fire Underwriters S. Sandler [the plaintiff] hereby agrees to pay the said Company [the defendant] annually, in advance, for the said Fire Alarm service in the above premises now occupied by . . . the sum of One Hundred Twenty-five Dollars . . . during such portion of a term of five years from the date when the first payment under this agreement is due, as the undersigned shall continue to occupy said premises. The first payment under this agreement shall be due January 1, 1929. In case additions or changes are made necessary in the system on account of alterations in the portion of the building occupied by the undersigned, or by fire, the same is to be paid for extra by the subscriber. The said Company may, during the continuance of this agreement, so far as the subscriber is concerned, maintain its wires, fixtures, and service connections in said premises. It is understood as a part of this agreement that the Boston Board of Fire Underwriters will make a reduction on the premiums on all fire insurance carried by the undersigned in said premises. This contract supersedes contract with John McGaw & Sons.  Boston, Jan 2, 1929.''

Over the defendant's objection, the trial judge admitted the testimony of the plaintiff of an alleged conversation in December, 1928, or January, 1929, with an official of the defendant, as to the nature of the services that were to be rendered by the defendant. In substance, this testimony was that the official told the plaintiff the service was ''automatic fire alarm and water flow''; that ''beside the ordinary service which was automatic fire alarm and water flow service, . . . they . . . [were to] notify the protective department immediately when an alarm sounded, and the protective department would be in . . . [the plaintiff's] premises in three or five minutes; they in turn would open the trap, if any water would be accumulated in the cellar, to let that water out, and they also had a key to come in and to let the protective department in the building if anything . . . [happened]''; that the service would operate ''If anything . . . [happened in] the building whether it is water flow or sprinkler head breaks or the pipe or any

water comes out from the sprinkler system, or fire, natu-
rally would sound an automatic fire alarm at their office."
In answer to the question, "Do you recall whether he said
anything about a runner coming from the company's
office?" the plaintiff testified: "That is what I meant by
them having a key. Their man supposed to call first the
office, open the door and let the department in that calls
at that time." The plaintiff testified further that nothing
was said about what would happen "if water appeared
from the pipes, if the pipes froze and broke or anything
like that." In answer to the question, "He just simply
said that if the water was released for any reason?" he re-
plied: "For any reason from the sprinkler system"; that
"it [the services] would cut down my insurance rate."
He also testified that, in 1933, he wrote to the defendant
respecting a reduction in rates, and an official of the
defendant again explained the service to him. Over the
defendant's objection he testified that, at that time, he
was told that "they . . . [would] give . . . [him] auto-
matic fire alarm and the water flow service, and also other
things which . . . [he had] explained before, as sending in
an alarm to the Protective and they . . . [would] call on
. . . [him] in a few minutes, and other things similar to
that"; that upon the release of any water from the pipes
or sprinkler heads, "it would sound an alarm if any water
comes out from any part of the sprinkler pipe, as well as
a fire alarm if any fire occurs in the building"; that upon
receipt of an alarm at the defendant's headquarters it
would notify the protective department immediately and
"their man supposed to be on the job sometime before the
protective department, some time before or same time as
the Protective, depends how far the place is, and open the
valves if any water comes in the cellar. That is, a man would
come immediately from their office to . . . [his] premises
upon the release of any water from the sprinkler system."

The writing signed by the parties states: the plaintiff's
premises, "being equipped" with the defendant's apparatus
"and the same being connected with its Central Station so
as to receive and send fire alarms . . . according to the

rules of the Boston Board of Fire Underwriters . . . ."
Over the defendant's objection the "Regulations of the
National Board of Fire Underwriters for the Installation,
Maintenance and Use of Central Station Protective Signal-
ing Systems for Watchman, Fire Alarm and Supervisory
Service" were admitted in evidence.   It could have been
found that the Boston board of fire underwriters has no
written regulations independent of those issued by the
national board, and had adopted no such regulations;  that
although the Boston board has not adopted the rules of the
national board, nevertheless it takes orders from the latter
and the regulations issued by the latter are used as a guide
by it;  that the defendant complies with the rules and
regulations of the Boston board which has some connection
with the national board.   The defendant's treasurer and
manager testified that the defendant complies with the
rules and regulations of the Boston board which has some
connection with the national board;  that the Boston board
makes its own rules to a certain extent;  that "generally
speaking he thinks that they govern themselves and their
affiliates, of which the defendant corporation is one, by the
regulations recommended by the National Board of Fire
Underwriters."   There was also evidence that the defendant
does not have regulations of the Boston board "separately
and independently" of those of the national board;  that
the defendant is guided by the Boston board requirements
and that those requirements are contained in the regula-
tions of the national board;  that there is a copy in the
defendant's office of one of the "National Board books";
that there are typewritten rules of the defendant for the
guidance of its station operators and that it is the type-
written rules "that . . . [it abides] by besides the rules of
the Board."

It is not entirely clear from the defendant's brief whether
its exception to the admission of these regulations is before
us.   But assuming that it is, we are of the opinion that
there was no error.   The regulations of the national board
were relevant on the issue of what rules, if any, the Boston
board had, and they constituted "a link in the chain of

proof." *Commonwealth* v. *Abbott*, 130 Mass. 472, 473. *Commonwealth* v. *Durkin*, 257 Mass. 426, 427–428.

It is not necessary for us to determine whether there was error in the admission of the conversation testified to by the plaintiff, for we are of the opinion that if we assume that the contract between the parties was to be found, as the judge instructed the jury, from the writing, the regulations, and the testimony as to the conversations between the plaintiff and the officials of the defendant, nevertheless the plaintiff is not entitled to recover.

There was evidence that as early as 7:45 o'clock on the morning of January 1, 1934, water was observed flowing from the plaintiff's building, as the result of the freezing and bursting of three sprinkler pipes and two sprinkler heads on the top floor. The defendant's service to the plaintiff's building consisted of systems of electrical circuits and associated instruments and devices. One of these systems was for the purpose of transmitting an alarm of fire to the defendant's central station and thence to the fire department and the headquarters of the Boston protective department. The other system, known as the "water flow alarm service," was designed to indicate the flow of water in the sprinkler system, and to indicate, at the defendant's central station, any leak or flow of water in the sprinkler system equal to or greater than at the rate of ten gallons per minute, this indication, in turn, being transmitted to the Boston protective department and in certain instances to the fire department as well. Each system is required to be and was operated over a separate circuit. The water flow alarm service circuit from the defendant's central station was so constituted that if water flowed in the sprinkler pipes there would be a change of pressure or storage of water in a device known as the "alarm pot," thereby causing the lifting of a valve which closed the circuit, and resulting in the passage through the transmitter of an alarm to the central station. This alarm pot is located on the sprinkler supply pipe ahead of the sprinkler heads, but is no part of the defendant's system. The defendant maintains its circuit wires up to the wires of

the circuit closer which also is a part of the sprinkler system and no part of the defendant's system or circuit. If the alarm pot does not function the system does not operate. There is no evidence that on the day in question any signal whatever was received at the defendant's central station over the water flow alarm circuit.

The fire alarm service operates over an independent circuit from the defendant's central station to thermostats located in the subscriber's building, and at a temperature of one hundred thirty degrees Fahrenheit the thermostats become operative. The electrical circuit is closed, and through a transmitter a signal is dispatched to the central station. The plaintiff's fire alarm circuit was numbered 32, and its box or station was 337. Both circuits are so arranged that if a fire or water flow signal comes in at the central station it is indicated on a tape by dots and dashes in sequence and numbers, so that, from an inspection of the tape, the source of the alarm may immediately be determined. As a part of the systems the circuits continue on from the central station to the fire houses and the headquarters of the Boston protective department where, in the event of a signal at the central station, it is repeated. There is no evidence that on the day in question any fire alarm signal was received over the plaintiff's circuit from his premises. These described systems of service are provided for in the regulations of the national board and there is no evidence that they were not installed and equipped in accordance with those regulations.

These regulations provide that the systems shall be under electrical supervision so that a break or ground that prevents the normal operation of the system will immediately be indicated by a distinctive trouble signal, and that the arrangement shall be such that signals of a break or ground shall not of themselves cause signals which shall be considered as indications of fires; and further, that circuits from the central station to signaling devices at protected premises shall be so arranged that a single break or a single ground will not prevent the performance of the intended function of a signaling system. There is a provision that

the "circuit adjusting means for emergency operation shall be automatic, or be provided through manual operation on receipt of a trouble signal." A break or ground that prevents the normal functioning of any circuit shall be automatically indicated at the central station by a trouble signal which will compel the attention of attendants, and a trouble signal shall be distinguishable from other signals except where such other signals denote an abnormal condition of parts of a fire extinguishing system. In connection with the water flow alarm service it is expressly provided that the trouble signals shall be distinctive and different. The electric supervision required covers all sources of energy except those for trouble indicating devices, so that failure of energy will be indicated by a trouble signal, and the current used for electrical supervision shall be sufficient to retain in normal condition all relays and other devices in a positive and reliable manner, with a suitable factor of safety, and to prevent derangement by shocks, jars, and vibrations. It is provided that each electrically supervised circuit shall be so connected that, in the event of a circuit trouble condition affecting the operation of the system, it will continuously operate a trouble bell or other approved device. Except such parts of circuits or appliances as are intentionally and permanently grounded in order to secure their normal operation, all systems shall normally test free of grounds. There is no evidence that the supervisory system of the defendant was not installed and maintained in accordance with these regulations.

About eight o'clock in the morning of January 1, 1934, a signal came to the defendant's central station over circuit 32, that is, the fire alarm circuit, but it was not a fire alarm signal. It is described in the bill of exceptions as an "escape" signal. The evidence as to the nature of this so called escape signal, its effect, and its relation to conditions on the circuit came almost entirely from officials and employees of the defendant, who were called as witnesses by the plaintiff. But if their evidence is disbelieved, as it may have been, there is no other evidence in the case bearing upon the subject matter. From this evidence it appeared

that the "escape" did not impair the effective operation of the system until shortly before a runner was dispatched to the plaintiff's premises. It was nothing that could not be adjusted and was not a dangerous escape. Circuit 32 covers several buildings and an escape, so called, may be in any of these buildings or in any of the wires leading from these buildings to the central station through the streets. Dampness of any sort may cause these escape signals and at times they are frequent. The amount of current escaping depends upon the resistance of the substance through which contact with the ground is made, but the grounding does not cause an alarm as it does not pass through the transmitter. When a signal other than a regular alarm comes in over either circuit, the indication of it on the recording tape is distinctly different from that caused by a regular alarm. A meter is attached to the circuit from which the amount of escape in milliamperes can be determined, and also whether a regular signal from the transmitter will "come in." Adjustments in the central station can be made by providing additional current to compensate for the current that is being lost through the ground or escape, and as long as such an adjustment can be made so that regular signals can come in the system is operating. The danger point is when the escape amount reaches forty milliamperes. The escape on the day in question went on during the morning from the time it was first observed, and at about 12:30 P.M. the first step was taken by the defendant to locate the trouble. At that time the amount of escape had reached forty milliamperes. The protective department arrived at the plaintiff's premises at 11:19 in the morning, but not as a result of any signal or information from the defendant.

The regulations of the national board provide: "122. Disposition of Signals. *a.* Upon receipt of trouble signals or other signals referring to matters of purely equipment maintenance of the signaling system, the operating company shall immediately send a runner to investigate and, if possible, see that the trouble is remedied at once. Written notice shall be given the inspection department having

jurisdiction and the property owner in all cases where service of the signaling system is interrupted and is not immediately corrected. *b.* Upon receipt of signals indicating flow of water in the system, the central station shall notify the insurance patrol and such other parties as the inspection department having jurisdiction may require. They shall also despatch a runner to the property. . . . *f.* Sprinkler system supervisory and other supervisory alarms shall be immediately communicated to a designated person at the plant protected, and shall be investigated by a runner unless supervised conditions are restored to normal . . . ." There was no evidence that any such person had been designated, and the "sprinkler system supervisory" was no part of the service supplied by the defendant except in so far as it is comprised in the "water flow alarm service," hereinbefore described. It is to be observed that there was no evidence of any signal over the water flow alarm circuit. Reading these regulations as a whole and having in mind especially the provisions which have been quoted or referred to herein, we are of the opinion that the signal which could have been found to have come in over circuit 32 is not such a trouble signal or other signal that refers to "matters of purely equipment maintenance of the signaling system" requiring the sending of a runner to investigate, as set out in regulation 122 *a.* We think this regulation relates solely or entirely to the maintenance by the defendant of its equipment in such a state that the system will function for the purpose for which it was intended, that is, the dispatch of alarms of fire or water flow from the premises in question to the defendant's central station. It is apparent that much of the time of the trial of the case was consumed in an inquiry as to what is a trouble signal and what an escape signal, whether they differ, and whether the signal in question was a trouble signal.

The jury was permitted to pass upon the question whether the signal which admittedly was received was one indicating flow of water. Obviously if it were, then under the provisions of regulation 122 *b* a runner should have been

dispatched to the property.  If it was a trouble signal or other signal coming within the provisions of 122 *a* the defendant was required to send a runner to investigate, but subsection *f* of that regulation does not require investigation by a runner upon the receipt of supervisory alarms if the supervised conditions are restored to normal.  The regulations contain a provision, in connection with electrical supervision, for the maintenance of sufficient current to maintain in normal condition all relays in a positive and reliable manner with a suitable factor of safety.  It appears that relays are used so that when a trouble signal comes in, the circuits may be disconnected and tested by the meter through the relay, and that the relay also strengthens the battery which is the source of power, making it possible to adjust the power so that a trouble or escape signal will no longer show on the recording tape, and that so long as the adjustment can be made that particular circuit is in working order.

The testimony of the runner who finally went to the building was that water had come from the broken sprinkler pipes and had partially grounded the fire alarm circuit wiring; that he made a test of both circuits; that he found that no alarm signal had passed over either circuit; and that the test signals that he sent to the central office worked all right, although he did not send the test signals from the alarm pot.  There was no evidence to contradict this, nor was there any other evidence bearing upon the condition of the circuits or any of the appliances located upon the plaintiff's premises.

The jury was permitted to determine whether the defendant had notice of the flowage of water, and, if it had no notice, whether this lack of notice was due to any defect or failure properly to operate the "mechanism" of the defendant, or "was the reason it had no notice of it due to a defect in some other mechanism or appliance over which it had no control, in this water pot or circuit breaker, or whatever it was"; that if no notice was received and this was "due to no failure or defect in its mechanism, that would not constitute a breach of its agreement."  No ex-

ception was taken to this portion of the charge. There was no direct evidence of a defect in any of the mechanism. There was no evidence that "this water pot or circuit breaker" was in operative condition. If it be assumed that a signal should have been received over the water flow alarm circuit and that the jury disbelieved the evidence to the effect that there was no defect in that part of the circuit controlled by the defendant, yet it would be a matter of conjecture, if an inference of a defect was permissible from the failure of the system to operate, whether that defect existed in the defendant's equipment or in that part over which it had no control. See *Libby, McNeill & Libby* v. *Illinois District Telegraph Co.* 294 Ill. App. 93, 108, 109. Compare *Gates* v. *Boston & Maine Railroad*, 255 Mass. 297, 301; *Walker* v. *Benz Kid Co.* 279 Mass. 533, 537.

The jury could have found the self evident fact that an escape is a deviation from normal. It could have found that an escape is an indication of trouble and that in the case at bar it was a deviation from the normal functioning of the fire alarm system. It indicated that there was a leakage of current to the ground somewhere on the plaintiff's circuit 32. It is true that if, when the signal came in over the fire alarm circuit, a runner had been sent to investigate, sooner or later he would have found that the water was escaping from the broken sprinklers on the plaintiff's premises, but it does not seem to us that that constitutes the test of whether the defendant is liable. It is to be borne in mind that the water flow alarm service, according to the regulation, was to indicate a leak or flow of water equal to or greater than at the rate of ten gallons per minute. There was no direct evidence that the flow equalled or exceeded this rate.

Reverting to the testimony of the plaintiff as to the alleged conversations with the officers of the defendant respecting the service that was to be rendered, we do not think it could have been found from it that the obligation of the defendant was any greater than, if as great as, that imposed by the regulations of the national board. It is to be observed that the conversation relates to the "auto-

matic fire alarm and water flow" service; that when an alarm is sounded the protective department will be notified; that if water comes out of the sprinkler system or there is a fire, an automatic fire alarm will sound in the defendant's office. In our opinion this testimony does not warrant a finding either directly or by inference that the defendant undertook to guarantee or insure the proper functioning of such parts of the alarm equipment as were in the care of the plaintiff and over which the defendant had no control.

In our opinion the defendant's motion for a directed verdict should have been granted. It therefore is unnecessary to consider any of the other exceptions.

*Exceptions sustained.*
*Judgment for the defendant.*